**Signed: September 21, 2005**

_Leslie Tchaikovsky_
_____
**LESLIE TCHAIKOVSKY**
**U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                          No. 04-41044 T
                                               Chapter 11
QMECT, INC.,

            Debtor.
_____/

THE OFFICIAL UNSECURED CREDITORS          A.P. No. 04-4189 AT
COMMITTEE FOR QMECT, INC.,

            Plaintiff,

    vs.

ELECTROCHEM FUNDING, LLC and
BURLINGAME CAPITAL PARTNERS II,
L.P.,,

            Defendants.
_____/

**MEMORANDUM OF DECISION**

In the above-captioned adversary proceeding, the Official

Unsecured Creditors' Committee (the "Committee") for Qmect, Inc.

(the "Debtor"), the above-captioned chapter 11 debtor, seeks to

determine the validity, priority, and extent of the liens on the

Debtor's property asserted by defendants Electrochem Funding, LLC

("Burlingame Funding") and Burlingame Capital Partners II, LP

("Burlingame")(collectively the "Lenders"). In the complaint (the "Complaint"), the Committee alleges various defects or limitations on the liens asserted by the Lenders. In February 2005, the Committee filed a motion for summary adjudication of certain issues raised by the Complaint (the "Committee's Motion"). The Lenders filed an opposition and cross-motion for summary adjudication (the "Lenders' Cross-Motion"). The Committee's Motion and the Lenders' Cross-Motion were fully briefed and were argued to the Court on May 6, 2005. At the end of the hearing, the Court took the motions under submission. The Court's conclusions with respect to the Committee's Motion are set forth in Section A below. The Court's conclusions with respect to the Lenders' Cross-Motion are set forth in Section B below.

## A. COMMITTEE'S MOTION

The Committee's Motion asks the Court for a summary adjudication of the following issues:

1. That the Lost Note and the Revolving Note are not cross-collateralized by the Comerica Deed of Trust.[1]

2. That Burlingame Funding has released its lien on certain equipment essential to the operation of the Debtor's business.

3. That neither of the Lenders has a lien upon the Debtor's bank deposit accounts.

4. That neither of the Lenders has a perfected security interest in the Debtor's delivery trucks.

---

[1]The terms used in this summary of the issues are explained more fully in the subsection discussing the particular issue.

2

5.  That the liens created on the Debtor's real property (the "Real Property") by the Lenders' deeds of trust are junior to the Alameda County real property tax lien (the "Real Property Tax Lien").

6.  That General Electric Capital Corporation's ("GECC") security interest in the Debtor's grid flooring and other fixtures is senior to the Lenders' liens.

7.  That Burlingame Funding does not hold a blanket lien on the Debtor's assets.

8.  That Burlingame Funding may not enforce the Lost Note against the Debtor.

9.  That Burlingame Funding cannot produce sufficient evidence to prove its claim pursuant to the Revolving Note.

10.  That Burlingame cannot produce sufficient evidence to prove its claim.

11.  That Burlingame's security interest is undersecured.

Each of these issues and the Court's rulings with respect to them are discussed below.

**1.  Lost Note and Revolving Note Are Not Cross-Collateralized by Burlingame Funding's Deed of Trust**

On or about December 17, 1998, the Koelling-McNeill Partnership (the "Partnership") executed a promissory note in favor of Comerica Bank-California, now known as Comerica Bank ("Comerica"). in the principal amount of $937,500.  (This is the note referred to herein as the "Lost Note.")  On or about February

3

5, 2004, Comerica assigned the Lost Note, among other things, to Burlingame.  Shortly thereafter, Burlingame assigned the Lost Note, among other things, to Burlingame Funding, a newly created affiliate of Burlingame.  The Committee refers to this note as the Lost Note because Comerica never delivered the original promissory note to Burlingame, and thus  Burlingame was unable deliver the original to Burlingame Funding.  To date, no one has been able to produce the original promissory note.[2]

On or about April 24, 2002, the Debtor executed a promissory note in favor of Comerica in the principal amount of $900,000 (the "Revolving Note"). Comerica also assigned the Revolving Note to Burlingame in early 2004, and, shortly thereafter, Burlingame assigned it to Burlingame Funding.[3]

The Committee asserts that the Lost Note and the Revolving Note are not cross-collateralized by the deed of trust in favor of Comerica, now held by Burlingame Funding (the "Comerica Deed of Trust").  The Lenders concede this issue.  In reply, the Committee asks the Court to summarily adjudicate this issue.  Since this issue is not in dispute, the Court will grant its request.

**2.  Burlingame Funding's Lien Releases**

The Committee notes that Burlingame Funding asserts a first priority "blanket lien" on all of the Debtor's property.  It observes that Burlingame Funding executed and filed with the

---

[2]The Lenders refer to the Lost Note as the Second Note.

[3]The Lenders refer to the Revolving Note as the Fourth Note.

4

California Secretary of State's Office a series of Uniform Commercial Code ("UCC") lien releases, releasing any liens in certain equipment owned or used by the Debtor: i.e., an industrial air exhaust system, a reverse osmosis water filtration system, a stainless parts drying assembly, three heat exchangers, an Uplast ventilator, thirty National Instrument network modules, and various wall units, base cabinets and cabinet countertops (the "Released Equipment"). The Committee asserts that the Released Equipment is essential to the Debtor's business operations and that, because Burlingame Funding does not have a lien on them, it does not have a "blanket lien" on the Debtor's assets. The Committee seeks summary adjudication on this issue.

Burlingame Funding concedes that it does not hold a lien on the Released Equipment but disputes that this deprives it of its "blanket lien." It asserts that the Released Equipment is all leased equipment and thus is not part of the Debtor's assets. However, it does assert a security interest in the related leases as contract rights. Burlingame Funding contends that the Court has already ruled that it is entitled to a "blanket lien" even if the lien does not extend to the Debtor's leased equipment.

Burlingame Funding also notes that the Committee asserts that some of the leases are not "true leases." To the extent this assertion is correct, it concedes that it does not have a lien on the equipment covered by the leases unless the equipment qualifies as a "fixture" and thus part of the Real Property, in which Burlingame Funding does assert a security interest. As the holder

5

of a lien on the Real Property, Burlingame Funding contends, it would have a right to reinstate any default by the Debtor on the relevant leases or to redeem the equipment by paying the secured debt in full. In support of these contentions, Burlingame Funding cites Cal. Civ. Code § 2924c and Cal. Comm. Code § 9623(a).

In reply, the Committee limits its summary adjudication request to a ruling that Burlingame Funding does not have a security interest in the leased equipment if the leases are "true leases" although it does have a lien on the leases as contract rights. The Court will grant this request.

### 3. Debtor's Bank Deposit Accounts

The Committee also contends that the Lenders do not have a "blanket lien" on the Debtor's assets because they do not have perfected liens on the Debtor's bank accounts. It notes that, to perfect a security interest in a deposit account, a secured creditor must have a "control agreement" with respect to the account. See Cal. Comm. Code §§ 9312(b)(1) and 9314.

The Lenders concede that they do not have a lien on the Debtor's bank accounts. However, they note that they do assert liens on the funds held in those accounts as the proceeds of their security interests in the Debtor's other assets. For this reason, they contend that their lack of a lien on the deposit accounts does not deprive them of their claim to a blanket lien. In reply, the Committee asks the Court to summarily adjudicate only that the

6

Lenders do not have a security interest in the Debtor's deposit accounts. The Court will grant this request.[4]

## 4. Debtor's Delivery Trucks

The Committee asserts that, on the petition date, the Debtor owned two delivery trucks. Both vehicles were being driven, and thus certificates of title had been issued by the California Department of Motor Vehicles (the "DMV"). The Committee notes that filing a UCC-1 financing statement is not sufficient to perfect a security interest in a vehicle covered by a certificate of title. The lien can only be perfected by having the lien noted on the original certificate of title. <u>See</u> Cal. Comm. Code § 9337. It contends that neither of the Lenders is noted as a lienholder on the certificates of title for the two vehicles.

The Lenders concede that they do not have a perfected security interest in the Debtor's two delivery trucks. In reply, the Committee asks the Court to summarily adjudicate that the Lenders

---

[4]The Committee notes that it disputes the Lenders' contention that they have a security interest in the funds in the Debtor's deposit accounts as the proceeds of their other collateral. They note that Cal. Comm. Code §§ 9315(b)(2) and 9315(d)(1) require the Lenders to trace the fund in the accounts back to their collateral. They have not done so to date. Moreover, even if they are able to do so, their security interests may be avoidable under 11 U.S.C. § 544. The Committee also notes that Cal. Comm. Code § 9315 makes the Lenders' claim junior to the rights of a transferee of money or funds from the account. According to the Committee, under 11 U.S.C. § 544, the Debtor has the same rights as a hypothetical transferee. The Court makes no ruling with respect to these contentions.

Case: 04-04189   Doc# 38   Filed: 09/21/05   Entered: 09/22/05 14:54:27   Page 7 of 62

do not have a security interest in the Debtor's two delivery trucks. The Court will grant this request.

**5. Priority of Lenders' Deeds of Trust Vis-a-Vis Real Property Tax Lien**

The Committee notes that, in California, real property taxes are automatically secured by a lien on the real property that is senior to any deeds of trust, no matter when the deeds of trust were recorded. It notes that, on the petition date, the Real Property was subject to a real property tax lien in the approximate amount of $114,439.

The Lenders challenge this contention on the ground that the Committee has failed to cite the relevant statute. However, the Lenders contend that, regardless of any senior real property tax liens, their deed of trust liens are still valid and give them a right of reinstatement and redemption. See Cal. Civ. Code § 2924c; Cal. Comm. Code § 9623(a).

In reply, the Committee cites Cal. Rev. & Tax. Code § 2187. It contends that it is entitled to summary adjudication of this issue which goes to priority only and does not assert that the existence of the Real Property Tax Lien renders the Lenders' liens invalid. The Court will grant the Commmittee's request for a summary adjudication that the Real Property Tax Lien is senior to any liens on the Real Property asserted by the Lenders.

**6. Relative Priority of GECC's and Lenders' Liens on Debtor's Grid Flooring and Other Fixtures**

8

The Committee notes that GECC, as successor in interest to Phoenixcor, Inc., asserts a secured claim of $155,805.25, secured by a first priority security interest in certain fixtures: i.e., the components in the grid flooring in the Debtor's electroplating facility, one HYDRO-MYSER Chiller, two W.W. Grainger Regenerative Blowers, two Tri-Mar Exhaust Blowers, and one Hydromatrix 786 IX 40 GPM System. This security interest was perfected by filing UCC-1 financing statements with the California Secretary of State's Office. The Committee contends that the Lenders' liens on these fixtures are junior to GECC's lien. The Committee contends that the grid flooring is essential to the operation of the Debtor's business. Thus, without a senior lien on these items, the Lenders do not have a "blanket lien" on the Debtor's assets.

In response, the Lenders concede that GECC's lien on certain fixtures is senior to the liens created by the recordation of their deeds of trust. However, they contend that the Committee's comments concerning the necessity of the grid flooring to the Debtor's business are unsupported by any evidence submitted in support of the Committee's Motion. In reply, the Committee asks the Court to summarily adjudicate only that GECC's lien on the grid flooring and other fixtures is senior to the Lenders' liens. The Court will grant this request.

**7.  Burlingame Funding's Assertion of a "Blanket Lien"**

The Committee notes that the Lenders have continually asserted that they hold "blanket liens" on the Debtor's assets. The Lenders now admit that they do not have a perfected lien on the

9

Debtor's bank accounts and delivery vehicles. In addition, Burlingame Funding admits that it has filed lien releases with respect to the Released Equipment. The Committee contends that the Debtor's business may not be operated without these items so that the Court should summarily adjudicate that the Lenders do not hold a "blanket lien" on the Debtor's assets.

The Lenders respond that the Court has already held that Burlingame Funding has a "blanket lien" on the Debtor's assets. They contend that the Court previously held that, even if the Lenders do not have a lien on the Released Equipment, this would only require a reduction in the value of Burlingame Funding's interest. In reply, the Committee describes in some detail the nature and function of the Released Equipment and its necessity to the business operations.

The Committee's request for summary adjudication of this issue is denied. The issue of whether the Lenders have a "blanket lien" on the Debtor's property is really an issue of whether the value of the Lenders' liens may be based on the Debtor's going concern business value. Thus, the issue is whether the Lenders' liens are sufficient to permit it, when foreclosing, to maintain the business operations without a significant break.

The Court previously made a ruling on this issue. However, it cannot recall the specifics of the ruling. The ruling may have been made orally on the record but the Court cannot locate it on the docket. There does not appear to have been a written memorandum of decision addressing this issue. The Court's best

10

recollection is that, in that context, the Lenders cited a Ninth Circuit Court of Appeals case compelling the conclusion that the Lenders hold "blanket liens" provided the liens reach all essential assets of the Debtor. Based on that authority, the Court believes that it ruled that assets that could easily be replaced, such as delivery trucks, would not disqualify the Lenders' liens as "blanket liens." The Court would include in the category of easily replaceable assets the funds in the Debtor's deposit accounts (assuming the Lenders cannot trace those funds back to their collateral).

However, the Released Equipment presents a more complicated question. To the extent the Released Equipment is leased equipment covered by "true leases" subject to the Lenders' liens, the Lenders' failure to hold liens against the Released Equipment would not disqualify their liens from being characterized as "blanket liens." To the extent any of the Released Equipment not covered by "true leases" has become a "fixture" and thus part of the Real Property, in which the Lenders hold a security interest, the Lenders' failure to hold liens against the Released Equipment would also not disqualify their liens from being characterized as "blanket liens."

However, if any of the Released Equipment that is essential to the Debtor's business and is not easily replaced is not the subject of a "true lease" and has not become a fixture and thus part of the Real Property, the Lenders' failure to hold liens on

11

that equipment may deprive them of their claim to a "blanket lien."[5]

## 8. Is Lost Note Unenforceable?

The Committee seeks a summary adjudication, declaring that Burlingame Funding cannot enforce the Lost Note. The Court declines to grant this request due to several issues which have not been adequately addressed, as noted below.

The Committee bases its request primarily on Cal. Comm. Code § 3309(a) which provides that, if the original promissory note has been lost, only a person who had possession of the note when it was lost can enforce it.[6] It is undisputed that neither of the Lenders ever received the Lost Note from Comerica. In addition to the plain language of § 3309(a), Committee cites <u>Dennis Joslin Co., L.L.C. v. Robinson Broadcasting Corp.</u>, 977 F. Supp. 491

---

[5]In their reply, the Committee contended for the first time that the Lenders could not create a "blanket lien" by combining their liens. Because this argument was raised first in the Committee's reply, the Lenders have not had an opportunity to respond to it. Therefore, the Court will not consider it at this time.

[6]Section 3309(a) of the California Commercial Code provides that: "A person not in possession of an instrument is entitled to enforce the instrument if (1) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (2) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (3) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process."

12

(D.D.C. 1997) and <u>State St. Bank & Trust Co. v. Lord</u>, 851 So. 2d 790 (Fla. Dist. Ct. App. 4th Dist. 2003).[7]

In <u>Joslin</u>, the plaintiff was the assignee of a note by a holder that had lost the note prior to the assignment. The <u>Joslin</u> court held that, under the plain language of the statute, the plaintiff did not qualify as a person who could enforce the note. In <u>Lord</u>, the plaintiff was the assignee of a mortgagee that was unable to establish that either it or the assignor mortgagee had ever had possession of the original promissory note. Following <u>Joslin</u>, the <u>Lord</u> court held that the plaintiff could not enforce the note.

Burlingame Funding responds that Cal. Comm. Code § 3309 only applies to negotiable instruments and that the Lost Note was not a negotiable instrument. Cal. Comm. Code § 3104 defines a "negotiable instrument" as one that makes an unconditional promise to pay a fixed amount of money on demand or at a definite time and, with limited exceptions, does not require the obligor to do anything other than pay the amount specified. Burlingame Funding contends that the Lost Note is "tied" to a "matrix of ...

---

[7]<u>Contra</u> <u>Nat'l Loan Investors, L.P. v. Joymar Assocs.</u>, 767 So. 2d 549 (Fla. Dist. Ct. App. 2000) and <u>YYY Corp. v. Gazda</u>, 761 A.2d 395 (N.H. 2000). The Committee acknowledges that there are other cases that do not follow <u>Joslin</u>. However, the Committee contends that these cases are "readily distinguishable." The Committee also cites <u>Cadle Co. of Conn. v. Messick</u>, 2001 Conn. Super. LEXIS 1752, 45 U.C.C. Rep. Serv. 2d (CBC) 563 (Conn. Super. Ct. 2001), an unpublished case, the subsequent history of which the Committee acowledges cannot be verified.

13

covenants ... and undertakings" such that the Lost Note cannot qualify as a negotiable instrument. For example, the Lost Note provides that the Debtor's breach of any other agreement with Comerica triggers a default and the right to accelerate the debt. Thus, according to Burlingame Funding, the Lost Note is not a negotiable instrument and thus not subject to Cal. Comm. Code § 3309.

The Court is willing to summarily adjudicate that Article 3 of the California Commercial Code, including § 3309, only applies to negotiable instruments. However, it is unable to summarily adjudicate that the Lost Note is a negotiable instrument because the copy of the Lost Note that has been provided to the Court is illegible.[8]

Next, Burlingame Funding contends that, even if the Lost Note is a negotiable instrument, it is entitled to enforce the note. Burlingame Funding argues that the Court should disregard the plain language of the statute and the case authority cited by the Committee. It asserts that other courts have construed § 3309(a) to permit an assignee to enforce a promissory note that was lost prior to its assignment. In support of this contention, Burlingame Funding cites, among other cases, <u>In re Caddo Parish-Villas South, Ltd.</u>, 250 F.3d 300 (5th Cir. 2001).

---

[8]From what the Court has been able to read, however, it appears likely that the Lost Note is a negotiable instrument and thus subject to § 3309.

14

In Caddo Parish-Villas, the debtor objected to a secured claim by Beal Bank made pursuant to a mortgage note acquired from the Department of Housing and Urban Development ("HUD"). The original of the note had been lost by HUD prior to the assignment. Like the Committee, the debtor relied on the plain language of the Louisiana version of UCC § 3309(a), which was identical to the Cal. Comm. Code § 3309(a). The Caddo Parish-Villas court affirmed the lower court's order, overruling the objection. It noted that § 1-103 of the Louisiana UCC stated that, in the absence of a specific provision, the other laws of the state apply. (Section 1103 of the California Commercial Code contains the same provision.)

The Caddo Parish-Villas court noted that Louisiana law provides that all rights may be assigned, except those that are strictly personal, and that a failure by the assignor to deliver all documents in its possession evidencing the assigned rights does not affect the validity of the assignment. Caddo Parish-Villas, 250 F.3d at 301-2. As a result, the court concluded that the assignee could enforce the assigned note as long as it presented sufficient evidence to establish that HUD was in possession of the note when the loss occurred. Id. at 302.

The parties have not addressed the issue of whether California law would permit the assignment of a right to enforce a lost negotiable instrument. However, even if California law would permit the assignment of the right to enforce a lost note, evidence must be presented that Comerica qualified as a person

15

entitled to enforce the Lost Note pursuant to Cal. Comm. Code §

3309(a) when the note was lost. This evidence has not yet been

provided.

Burlingame Funding also notes that the Official Comment to UCC

§ 9-109 contains the following statement, repudiating <u>Joslin</u>:

> [T]he right under Section 3-309 to enforce a
> lost, destroyed or stolen negotiable
> promissory note may be sold to a purchaser who
> could enforce that right by causing the seller
> to provide the proof required under that
> section. This Article rejects decisions reach
> a contrary result, e.g. <u>Dennis Joslin Co. v.
> Robinson Broadcasting</u>, 977 F. Supp. 491
> (D.D.C. 1997).

The significance of this comment is unclear. It is puzzling why

this comment is placed in Article 9, rather than Article 3.[9]

The Court is not certain that the comment is relevant at all.

It has been unable to determine when the comment was written.

Section 3-309(a) of the Uniform Commercial Code was amended in

2002 to state that a person not in possession of an instrument is

entitled to enforce it if the person acquired the instrument,

either directly or indirectly, from a person who was entitled to

enforce the instrument when loss of possession occurred...."

However, California has not adopted the amended form of UCC § 3-

309(a). Although the comment quoted above is included in the

annotated California Code, it may have been referring to UCC § 3-

---

[9]Section 9109 is part of Article 9 of the California
Commercial Code which deals with secured transactions. It
describes the types of transactions to which Article 9 applies.
Included in the list is the sale of promissory notes. <u>See</u> Cal.
Comm. Code § 9109(a)(3).

16

309(a), as amended but not adopted by California. The Court seeks further guidance from the parties on this issue.

In any event, the Court is not certain that the necessary result of the conclusion that Burlingame Funding is not entitled to enforce the Lost Note is that Burlingame Funding is not entitled to payment of its claim. The result may simply be that Burlingame Funding is required to present evidence to prove its claim.[10]

### 9. Will Burlingame Funding Be Unable To Establish the Amount of its Claim Under Revolving Note?

The Committee notes that Burlingame Funding filed a proof of claim on or about April 30, 2004 (the "Burlingame Funding Proof of Claim"), alleging a secured claim against the Debtor on the petition date in the principal amount of $2,520,054.18 plus unpaid interest of $32,194.82. It observes that the Burlingame Funding Proof of Claim does not specify the amounts owed under each of the four promissory notes acquired from Comerica (via Burlingame). Neither does it specify which claims are secured by personal property and which by real property. In addition, although it includes a claim for attorneys' fees and costs, it does not identify the amount of attorneys' fees and costs incurred as of

---

[10]The introduction of a promissory note in evidence relieves the plaintiff of this burden, at least as an initial matter, because it establishes a prima facie right to recover according to the terms of the note. <u>Saks v. Charity Mission Baptist Church</u>, 90 Cal. App. 4th 1116, 1133 (2001). This issue has not been addressed by the parties.

17

the petition date, either in the aggregate or on a note-by-note basis.

The Committee points out that Rule 3001(c) of the Federal Rules of Bankruptcy Procedure requires either the original or a duplicate of any writing upon which the claim is based to be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction must be filed with the claim in instead. Rule 3001(d) provides that, if a security interest is claimed, the proof of claim must be accompanied by evidence of perfection of the security interest.

The Committee contends that Burlingame Funding has failed to comply with either of these provisions. As a result, it contends, the Burlingame Funding Proof of Claim is not entitled to be considered prima facie evidence of Burlingame Funding's claim. As a consequence, Burlingame Funding must come forward with sufficient evidence to prove its claim. <u>Remington Investments, Inc. v. Moussa Nikbakht Hamedani</u>, 55 Cal. App. 4th 1033, 1041 (1997).

The Committee notes that one of the principals of Burlingame Funding, Robert Judson ("Judson"), recently signed a declaration stating the amounts purportedly owed under the four notes previously held by Comerica and now held by Burlingame Funding. Although the principal amount was the same as the amount set forth in the Burlingame Funding Proof of Claim, the interest figure was different. There is no explanation for the variance. Moreover,

18

the declaration does not break down the amounts owed on a note by note basis either.      The Committee asserts that it does not appear that Judson has sufficient personal knowledge of the amounts due under the notes to provide the required evidence. Burlingame Funding has been unable to provide the Committee with any business records demonstrating the advances or payments under the Lost Note or Revolving Note.  The Committee also contends that Burlingame Funding cannot rely on the Debtor's books and records to establish the amount of the debt.  Burlingame Funding has alleged that those books and records are inaccurate, and the Debtor has admitted that they are.

In response, Burlingame Funding acknowledges that it is required to establish the amount of its claim.  It expresses the belief that Comerica has the necessary records and claims to have recently subpoenaed them.  However, it expresses doubt that the Debtor's records are so inaccurate that they would be insufficient to establish the amounts owed if Comerica no longer has the necessary records.  It opposes summary adjudication of this issue until it has a chance to complete its discovery.

In another adversary proceeding in this case, the Court has already concluded that the form of the Burlingame Funding Proof of Claim is inadequate to establish a prima facie case in support of its claim.  Consequently, consistent with that ruling, the Court grants the Committee's request to summarily adjudicate that Burlingame Funding has both the burden of producing sufficient evidence to establish its claim against the estate and the

19

collateral securing it as well as the burden of persuasion on those issues.

## 10. Will Burlingame Be Unable To Establish Amount of Its Claim?

The Committee notes that Burlingame also filed a proof of claim on or about April 30, 2004 (the "Burlingame Proof of Claim"). The Burlingame Proof of Claim asserted an amount due of $3,047,836.215 plus attorneys' fees and costs. Like the Burlingame Funding Proof of Claim, the Burlingame Proof of Claim failed to comply with Rule 3001(c) & (d) by attaching a copy of the writing upon which the claim was based and proof of perfection of the security interest. Thus, according to the Committee, the Burlingame Proof of Claim is not entitled to be treated as prima facie evidence of the claim's validity either. In re Consolidated Pioneer Mortgage, 178 B.R. 222, 226-27 (Bankr. 9th Cir. 1995). The Committee contends that, like Burlingame Funding, Burlingame must come forward with its own evidence establishing the amount of its claim and, as discussed above, cannot rely on the Debtor's books and records to do so.

Burlingame responds that it has produced sufficient evidence of its advances to the Debtor and of the payments received from the Debtor. If more evidence is required, it intends to obtain that evidence from the Debtor. In reply, the Committee states that there is no competent evidence to establish the amount of Burlingame's claim. Moreover, the Debtor has made over $100,000 in post-petition payments to Burlingame for which no credit has

20

been applied. As noted above, the Debtor's pre-petition records are unreliable, and the Lenders have said as much in documents filed with the Court.

The Court grants the Committee's request to summarily adjudicate that Burlingame is required to prove its claim and may not rely on the Burlingame Proof of Claim to establish a prima facie case in support of its claim. The Court denies the Committee's request to summarily adjudicate that Burlingame is unable to prove its claim. Burlingame does not appear to seek summary adjudication of the amount of its claim. However, if it had, the Court would deny that request as well. The Court is unable to determine from what has been filed to date the validity and amount of Burlingame's claim as a matter of law.

**11. Whether Burlingame's Secured Claim Is Undersecured.**

Finally, the Committee contends that, based on the value of the Debtor's assets and the amount of Burlingame Funding's likely claim, Burlingame's claim is undersecured. As a result, Burlingame is not entitled to recover its post-petition interest, costs, or attorneys' fees. In its response, Burlingame concedes that its claim is undersecured. In reply, the Committee asks the Court to summarily adjudicate this issue. The Court will grant this request.[11]

---

[11]In its opposition to the Lenders' cross-motion, the Committee asks the Court to summarily adjudicate that Burlingame Funding's secured claim is also undersecured. This request is procedurally improper and, on that basis, the Court declines to grant it. Moreover, the Court does not believe that there is a

21

## B.  LENDERS' CROSS-MOTION

The Lenders' Cross-Motion seeks summary adjudication of the following additional issues:[12]

1. Whether the Comerica Deed of Trust's designation of the Debtor's predecessor in interest as the debtor prevents Burlingame Funding from enforcing the lien against the Debtor.

2. Whether Burlingame Funding's failure to record the assignment of the Comerica Deed of Trust until after the petition date prevents Burlingame Funding from enforcing it.

3. Whether the form of the Debtor's name on the UCC-1 financing statements renders them unenforceable.

4. Whether the Debtor's failure to sign an amendment to the UCC-1 financing statement renders it unenforceable.

5. Whether the failure to check the box in Item 9 of the UCC-1 financing statement amendment invalidates the amendment.

6. Whether Fred Koelling's signature was sufficient to bind the Partnership.

7. Whether Fred Koelling's signature was sufficient to bind the Debtor.

---

sufficient evidentiary basis at present for it to make such a determination.

[12]The Lenders note that many of the Committee's allegations with respect to alleged defects in Burlingame Funding's security documents are also made with respect to Burlingame's security documents.  Although in their arguments, for the most part, they only refer to the claims against Burlingame Funding, they note that the same arguments apply to Burlingame and thus are not repeated.  To the extent the issues are identical, the Court's rulings are also identical.

22

8. Whether there is any evidence to support the Committee's allegation that the Burlingame Deed of Trust was altered after it was executed by the Debtor.

9. Whether the interest rate on the Burlingame Deed of Trust was usurious.

**1. Comerica Deed of Trust's Designation of the Partnership as Debtor**

In paragraph 17 of the Complaint, the Committee contends that Burlingame Funding's security interest in the fixtures located on the Real Property (the "Fixtures") is unperfected and thus avoidable under 11 U.S.C. § 544(a)(1). It bases this argument on the fact that the Comerica Deed of Trust, upon which Burlingame Funding relies for its security interest in the Fixtures (the "Fixture Deed of Trust"), names the Partnership, rather than the Debtor, as the debtor.[13]         Burlingame Funding seeks a summary adjudication that this claim has no merit. It notes that, when the Comerica Deed of Trust was executed and recorded, the Partnership owned the Fixtures and the recordation of the Comerica Deed of Trust perfected Comerica's security interest in the Fixtures. It contends that the transfer of the Fixtures by the Partnership to the Debtor did not require any additional filing, naming the Debtor as debtor, to maintain the perfected status of the security interest, at least as to those fixtures existing at

---

[13]The Debtor is a separate entity from the Partnership, not simply a change in its form. The Debtor acquired its assets from the Partnership.

23

the time of the transfer or acquired by the Debtor within four months. The Court agrees.

Section 9502 of the California Commercial Code provides, in pertinent part, as follows:

> (a) Subject to subdivision (b), a financing statement is sufficient only if it satisfies all of the following conditions: (1) It provides the name of the debtor. (2) It provides the name of the secured party or a representative of the secured party. (3) It indicates the collateral covered by the financing statement.
>
> (b) Except as otherwise provided in subdivision (b) of Section 9501, to be sufficient, a financing statement ... which is filed as a fixture filing and covers goods that are or are to become fixtures, must satisfy subdivision (a) and also satisfy all of the following conditions:
> (1) Indicate that it covers this type of collateral.
> (2) Indicate that it is to be recorded in the real property records.
> (3) Provide a description of the real property to which the collateral is related sufficient to give constructive notice of a mortgage under the law of this state if the description were contained in a record of the mortgage of the real property.
> (4) If the debtor does not have an interest in the real property, provide the name of the record owner.
>
> (c) A record of a mortgage is effective, from the date of recording, as a financing statement filed as a fixture filing ... only if all of the following conditions are satisfied:
> (1) The record indicates the goods or accounts that it covers.
> (2) The goods are or are to become fixtures related to the real property described in the record....
> (3) The record satisfies the requirements for a financing

24

> statement in this section other than an
> indication that it is to be filed in the real
> property records.
> (4) The record is duly recorded.

Pursuant to these provisions, the Comerica Deed of Trust qualified as a "fixture filing" financing statement at the time it was recorded. The Committee does not appear to contend otherwise. Thus, the only question is whether anything was required to be filed when the Real Property and Fixtures were transferred by the Partnership to the Debtor to maintain the perfected status of Comerica's security interest.[14]

Burlingame Funding contends that nothing further had to be filed to maintain Comerica's perfected security interest after the Real Property and Fixtures were transferred to the Debtor, including as to fixtures acquired by the Debtor within four months after the transfer. In support of this position, it cites Cal. Comm. Code     § 9508. Section 9508 provides, in pertinent part, as follows:

> (a) Except as otherwise provided in this
> section, a filed financing statement naming an
> original debtor is effective to perfect a

---

[14]The Committee does not appear to contend, at least in this context, that Comerica's transfer of its security interest to Burlingame and Burlingame's transfer to Burlingame Funding caused the security interest, if perfected, to become unperfected. See also Cal. Comm. Code § 9310(c)(no additional filing is required to continue the perfected status of a security interest if a secured party assigns a perfected security interest). Moreover, because the fixture financing statement is contained in a deed of trust, Comerica was not required to file a continuation statement to continue the perfected status of its security interest. See Cal. Comm. Code § 9515(g).

25

security interest in collateral in which a new debtor[15] has or acquires rights to the extent that the financing statement would have been effective had the original debtor acquired rights in the collateral.

(b) If the difference between the name of the original debtor and that of the new debtor causes a filed financing statement that is effective under subdivision (a) to be seriously misleading[16] under Section 9506, the following rules apply:
(1) The financing statement is effective to perfect a security interest in collateral acquired by the new debtor before, and within four months after, the new debtor becomes bound under subdivision (d) of Section 9203.
(2) The financing statement is not effective to perfect a security interest in collateral acquired by the new debtor more than four months after the new debtor becomes bound under subdivision (d) of Section 9203 unless an initial financing statement providing the name of the new debtor is filed before the expiration of that time.

The Court agrees with Burlingame Funding that the effect of Cal. Comm. Code § 9508 is that the security interest in the Fixtures perfected by Comerica by recording the Comerica Deed of Trust

_____

[15]The term "new debtor" is defined as "a person that becomes bound as debtor under subdivision (d) of Section 9203 by a security agreement previously entered into by another person. See Cal. Comm. Code § 9102(a)(56). At or about the time the Real Property and Fixtures were transferred to the Debtor, the Debtor executed an agreement pursuant which it assumed the Partnership's obligations to Comerica (the "Assumption Agreement"). The Assumption Agreement was recorded in November 2001. Thus, the Debtor qualifies as a "new debtor" for purposes of Cal. Comm. Code § 9508(a).

[16]For purposes of Division 9 of the California Commercial Code, the name of a new debtor is seriously misleading if a search of the records of the filing office under the original debtor's name, using the filing office's standard search logic, if any, would not disclose the financing statement. See Cal. Comm. Code § 9506(c).

26

continued after the Real Property and Fixtures were transferred to the Debtor as to any fixtures on the Real Property prior to the transfer or acquired by the Debtor within four months after the transfer.[17]

Finally, the priorities established by Cal. Comm. Code § 9334(e) prevent a trustee or debtor-in-possession to avoid Burlingame Funding's security interest in the Fixtures, exercising the rights of a hypothetical judicial lien creditor whose lien attached as of the bankruptcy petition date. Section 9334(e) provides as follows:

> (e) A perfected security interest in fixtures has priority over a conflicting interest of an encumbrancer...of the real property if:
> (1) The debtor has an interest of record in the real property...and both of the following conditions are satisfied:
> (A) The security interest is perfected by a fixture filing before the interest of the encumbrancer...is of record.
> (B) The security interest has priority over any conflicting interest of a predecessor in title of the encumbrancer....

The security interest asserted by Burlingame Funding was perfected before the Debtor's bankruptcy petition date and would have

_____

[17]Burlingame Funding implicitly concedes that the Fixture Deed of Trust would not give it a perfected security interest in fixtures acquired by the Debtor more than four months after Koelling-McNeill's transfer of the Real Property and Fixtures to the Debtor. There is no evidence that the Debtor acquired any fixtures more than four months after the Real Property and Fixtures were transferred to it. Absent such evidence, the Court declines to address whether Burlingame Funding would have a perfected security interest in any such fixtures.

27

priority over any conflicting interest of a predecessor to the judicial lien creditor. Thus, Burlingame Funding is entitled to a summary adjudication that it has a perfected security interest in the Fixtures to the extent the Fixtures were acquired before or within four months of the transfer of the Real Property to the Debtor.

**2. Burlingame Funding's Failure To Record Assignment of Comerica Deed of Trust**

Paragraph 19 of the Complaint alleges that Burlingame Funding's security interest in the Fixtures and in the Debtor's personal property is unperfected because no assignment of the security interest was filed or recorded before the Debtor's bankruptcy petition was filed. Burlingame Funding seeks a summary adjudication, declaring that these claims are without merit. It contends that it was not required to file or record an assignment of Comerica's Deed of Trust or UCC-1 financing statements to continue the perfection of the security interest in the Fixtures and the Debtor's personal property. The Court concludes that Burlingame Funding is entitled to the requested summary adjudication.

In support of its contention that the security interest in the Fixtures and the Debtor's personal property remained perfected notwithstanding Burlingame's failure to record assignments of the security interest prior to the bankruptcy petition date, Burlingame Funding cites Cal. Civ. Code §§ 2934 and 2936 and Cal.

28

Comm. Code § 9310(c). Cal. Civ. Code § 2934 provides, in pertinent part, as follows:

> Any assignment of ... the beneficial interest under a deed of trust may be recorded, and from the time the same is filed for record operates as constructive notice of the contents thereof to all persons....

Cal. Civ. Code § 2936 provides that "[t]he assignment of a debt secured by mortgage carries with it the security." Cal. Comm. Code § 9310(c) provides that:

> If a secured party assigns a perfected security interest..., a filing under this division is not required to continue the perfected status of the security interest against creditors of and transferees from the original debtor.

Burlingame Funding contends that there is no dispute that the Debtor's debt to Comerica was assigned to Burlingame, that Burlingame assigned it to Burlingame Funding, or that Comerica's security interest in the Fixtures and the Debtor's personal property was properly perfected before the debt was assigned. Therefore, according to Burlingame Funding, as a result of the assignment of the debt, it holds a perfected security interest in the Fixtures and in the Debtor's personal property notwithstanding its failure to file or recorded an assignment of the security interest. It notes that Cal. Civ. Code § 2934 uses the word "may." Thus, recording an assignment of the beneficial interest of a deed of trust is optional, not mandatory.

The Committee reads Cal. Civ. Code § 2934 as implying, if not expressly stating, that recordation of an assignment of a deed of

Case: 04-04189   Doc# 38   Filed: 09/21/05   Entered: 09/22/05 14:54:27   Page 29 of 62

trust is required to perfect the security interest of the assignee. This argument would have merit if the dispute were with another purported assignee of Comerica who recorded its assignment first. As noted above, Cal. Civ. Code § 2934 states that, if the assignment is recorded, it operates as constructive notice to all persons of its contents from the date of recordation. However, a transferee of the Real Property (as opposed to a subsequent assignee of Comerica's security interest) would still have constructive notice of Comerica's perfected security interest in the Real Property. The fact that the transferee would not have constructive notice that Comerica had assigned that security interest to a third party would not render the security interest unperfected.

The Committee agrees that, pursuant to Cal. Comm. Code § 9310(c), an assignment of a perfected security interest by the "original debtor" need not be filed to continue the perfection of a security interest in personal property. However, it asserts that this provision only protects the assignment by Comerica to Burlingame. According to the Committee, § 9310(c) does not protect the assignment by Burlingame to Burlingame Funding because, according to the Committee, the Debtor does not qualify as an "original debtor." At least with respect to the first financing statement, according to the Committee, the Partnership was the "original debtor."

This contention has no merit. Section 9102(a)(60) of the California Commercial Code defines a "new debtor" as a "person

30

that, as debtor, entered into a security agreement to which a new debtor has become bound under subdivision (d) of Section 9203." However, it expressly states that this definition does not apply to the use of the phrase "new debtor" in Section 9310(c).

As discussed above, Cal. Comm. Code § 9508(a) provides that a perfected security interest in personal property remains perfected when a new debtor acquires rights in the collateral. Section 9508(b)(1) provides that, even if the new debtor becomes bound by the security agreement, the perfected security interest attaches to collateral acquired for four months after the transfer. Thereafter, a new financing statement naming the new debtor is required. In fact, after the Partnership transferred its assets to the Debtor and the Debtor assumed the Partnership's debts to Comerica, on December 6, 2001, Comerica filed an amendment to the first financing statement, changing the debtor's name from the Koelling-McNeill Partnership to Qmect, Inc.

The Committee also contends that when, in 2003, Comerica Bank-California, a California banking corporation, the "original debtor," merged into Comerica Bank, a Michigan corporation, it was required to record an assignment of the security interest reflected in any UCC-1 financing statements previously filed with respect to the Debtor's personal property. In support of this

31

contention, it cites In re Copper King Inn, Inc., 918 F.2d 1404, 1407-09 (9th Cir. 1990). No such assignment was recorded.[18]

The Court finds Copper King distinguishable. In Copper King, the secured creditor was not listed on the financing statement at all. The parties listed as the secured creditors were officers, directors, and shareholders of the debtor. Id., at 1405. The Copper King court rejected the argument that inquiries could have been made to these individuals who would have clarified who was the true secured creditor. It noted that there was no guarantee that these insiders would have provided accurate information given their incentive to provide misinformation. Id. at 1408.

The Copper King court distinguished In re Wilco Forest Machinery, Inc., 491 F.2d 1041 (5th Cir. 1974), in which the validity of a financing statement was upheld although the secured creditor had merged into a separate corporation prior to the bankruptcy of the debtor and the financing statement had not been amended to reflect the change. The merger of Comerica Bank-

───────────────

[18]The Committee also asserts that, although the failure to record an assignment of the deed of trust after the merger and resulting name change did not render Comerica's security interest in the Fixtures and Real Property unperfected, it did prevent Comerica and its successors in interest from foreclosing on its collateral nonjudicially. See Miller & Starr, California Real Estate, 3rd ed., Deeds of Trust, 10:39, citing Cal. Civ. Code     § 2932.5 (assignee of debt secured by deed of trust acquires power to sell nonjudicially only if assignment is duly acknowledged and recorded). Burlingame Funding responds that it is not seeking a determination that it is entitled to foreclose on its collateral nonjudicially.

32

California into Comerica Bank falls within the holding of <u>Wilco Forest</u> rather than that of <u>Copper King</u>.

Finally, the Committee acknowledges that Burlingame Funding filed an assignment of the Comerica Deed of Trust one week after the Debtor's bankruptcy petition was filed. However, the Committee contends that this post-petition recordation of the assignment violated the automatic stay and was thus void. Burlingame Funding responds that the Committee cites no authority for its contention that the post-petition recordation of the assignment of the Comerica Deed of Trust violated the automatic stay.

The Court concludes that the Committee is in error in its assertion that the recordation of the assignment post-petition violated the automatic stay. The recordation of the assignment was not attempt to create, perfect, or enforce a lien against the Real Property. It did not diminish the estate in any way; it simply substituted one secured party for another. <u>See</u> <u>In re Patton</u>, 314 B.R. 826, 834 (Bankr. D. Kan. 2004); <u>In re Citicorp Park Assocs.</u>, 173 B.R. 823 (Bankr. D. Me. 1994).

**3. Form of Debtor's Name on UCC-1 Financing Statements**

Paragraphs 20 and 22 of the Complaint allege that Burlingame Funding's security interest in the the Debtor's personal property is unperfected because, as of the petition date, the UCC-1 financing statements on file with the California Secretary of State's Office named the Partnership, rather than the Debtor, as the debtor. Thus, according to the Committee, they were seriously

33

misleading. In its motion for summary adjudication, Burlingame Funding seeks a determination that this claim has no merit. Burlingame Funding notes that amendments to the financing statements were filed changing the debtor's name to Qmect, Inc. Copies of the amendments are attached as Exhibit U7 to the Request for Judicial Notice in support of its motion.

In any event, Burlingame Funding argues, because the security interest was perfected prior to the sale of the Debtor's personal property by the Partnership to the Debtor, the security interest remained perfected notwithstanding the sale. In support of this contention, it cites Cal. Comm. Code §§ 9507(a) and 9315(a)(1). Section 9507(a) provides that:

> A filed financing statement remains effective with respect to collateral that is sold, exchanged, leased, licensed, or otherwise disposed of and in which a security interest ... continues, even if the secured party knows of or consents to the disposition.

Section 9315(a)(1) provides that:

> Except as otherwise provided in this division and in subdivision (2) of Section 2403, ...
>     (1) A security interest ... continues in collateral notwithstanding sale ... or other disposition thereof unless the secured party authorized the disposition free of the security interest ....

In addition, Burlingame Funding contends, the financing statements were sufficient to perfect a security interest in personal property acquired by the Debtor to the same extent they would have been effective if the Partnership had acquired the personal property. In support of this contention, Burlingame

34

Funding cites Cal. Comm. Code § 9508(a). Section 9508(a) provides that:

> Except as otherwise provided in this section, a filed financing statement naming an original debtor is effective to perfect a security interest in collateral in which a new debtor has or acquires rights to the extent that the financing statement would have been effective had the original debtor acquired rights in the collateral.

If a creditor could not identify the new debtor as the owner of the collateral using the standard search logic of the recording office, the secured creditor's rights are limited to collateral obtained by the new debtor within four months after its acquisition of the original debtor's personal property collateral. See Cal. Comm. Code §§ 9506 & 9508(b). However, Burlingame Funding argues that, because it filed an amended financing statement less than four months after the Debtor obtained the collateral from the Partnership, changing the name of the debtor from Koelling-McNeill Partnership to Qmect, Inc., its security interest is not limited to personal property acquired by the Debtor within four months of the transfer.

The Committee responds that Burlingame Funding has misread its allegations. It contends that the Complaint does not allege that Burlingame Funding's security interest in the Debtor's personal property is unperfected because the Debtor's name on the financing statements is incorrect. The Complaint alleges that certain of the financing statements did not state the correct name and address of the secured party or the correct address of the Debtor

35

and that the names and addresses that were stated on those financing statements were seriously misleading.

As a result, the Complaint claims, Burlingame Funding's security interest in the Debtor's personal property is unperfected and avoidable under 11 U.S.C. § 544(a)(1). Since Burlingame Funding has failed to address these allegations, according to the Commmittee, its request for summary adjudication with respect to the allegations contained in paragraphs 20 and 22 should be denied.

Burlingame Funding responds that, if the allegations are that its security interest in the Debtor's personal property is unperfected because, as of the bankruptcy petition date, the financing statement failed to name Burlingame as the secured party or to provide Burlingame's address, the claim should still be summarily adjudicated as having no merit. It bases this argument on Cal. Comm. Code § 9310. As noted above, § 9310(c) provides that:

> If a secured party assigns a perfected security interest..., a filing under this division is not required to continue the perfected status of the security interest against creditors of and transferees from the original debtor.

Regardless of the merits of this response, because it was raised for the first time in Burlingame Funding's reply, the Court will not consider it at this time. The Committee is correct that Burlingame Funding's original argument mischaracterizes the allegations of paragraphs 20 and 22. By addressing the true

36

allegations of those paragraphs for the first time in its reply, Burlingame Funding has deprived the Committee of its opportunity to respond to its only relevant argument.

**4.   Debtor's Failure To Sign Amendments to UCC-1 Financing Statements**   Paragraph 21 of the Complaint alleges, among other things, that Financing Statement Amendment No. 01341C0773 ("Amendment to Financing Statement 177"), which purports to amend Financing Statement No. 9703160177 ("Financing Statement 177"), is invalid because it is not signed by the Debtor.  Similarly, paragraph 23 of the Complaint alleges, among other things, that Financing Statement Amendment No. 02161C0287 ("Amendment to Financing Statement 476"), which purports to amend Financing Statement No. 9430760476 ("Financing Statement 476"), is invalid because it is not signed by the Debtor.

Burlingame Funding seeks a summary adjudication, declaring that this claim has no merit.  It asserts that a debtor's signature is no longer required on either the original financing statement or an amendment thereto.  In support of this proposition, it cites Cal. Comm. Code §§ 9502(a) and 9509(b). Section 9502(a) provides, in pertinent part, that:

> ... a financing statement is sufficient only if it satisfies all of the following conditions:     (1) It provides the name of the debtor.     (2) It provides the name of the secured party ....
>                                 (3) It indicates the collateral covered by the financing statement.

Section 9509(b) provides that:

37

> By authenticating or becoming bound as debtor by a security agreement, a debtor or new debtor authorizes the filing of an initial financing statement, and an amendment, covering both of the following:
> (1) The collateral described in the security agreement.
> (2) Property that becomes collateral under paragraph (2) of subdivision (a) of Section 9315, whether or not the security agreement expressly covers proceeds.

Burlingame Funding notes that there is not even a signature line for the debtor on the official amendment form.

The Committee responds that it does not contend that the Debtor had to sign the financing statements or amendments thereto. This is not precisely true. As noted above, one of the defects alleged by the Committee in paragraph 21 and 23 is the Debtor's failure to sign the amendments. However, apparently, the Committee has abandoned this allegation. Therefore, Burlingame Funding is entitled to a summary adjudication of this issue.

**5. Failure To Check Box or To Provide Name and Address of New Debtor in Item 9 of the Amendments**

Paragraph 21 of the Complaint also alleges that Financing Statement 177 is invalid because it does not name the Debtor as the debtor[19] and that the Amendment to Financing Statement 177, which purports to add the name of the Debtor in place of the name of the Partnership, contains Comerica's name instead of the

---

[19]This financing statement was filed on January 28, 1997, before the Debtor was formed. It names the Partnership as the debtor.

38

Debtor's in Item 9a. It alleges that Financing Statement 177 is also invalid because the box in Item 9a is not checked indicating that the amendment reflects the addition of a debtor or the addition or deletion of collateral rather than the assignment of the security interest. Paragraph 23 of the Complaint alleges that the Amendment to Financing Statement 476 is invalid for the same reasons as the Amendment to Financing Statement 177.

Burlingame Funding seeks a summary adjudication that the amendments are valid and effective to perfect its security interest in the described collateral, including personal property acquired thereafter by the Debtor. First, it contends that it was not required to check the box in Item 9a or to enter the Debtor's name in Item 9a. It asserts that this box only applies to amendments filed *solely* under the authority of the Debtor. In support of this argument, it relies on a paragraph from the Instructions for National UCC Financing Statement AMENDMENT (Form UCC3) (the "UCC Form Instructions"). It contends that the amendments at issue here were not filed *solely* under the authority of the Debtor. This argument has no merit. The language quoted from the UCC Form Instructions does not use the word "solely," only the word "authorized." Burlingame Funding does not contend that the Debtor did not authorize the filing of the amendments.

Next, Burlingame Funding contends that it properly completed the two amendments. It notes that the purpose of the Amendment to Financing Statement 177 was to change the name the debtor: i.e.,

39

from the Koelling-McNeill Partnership to Qmect, Inc. It states that the UCC Form Instructions advise the person completing an amendment form for this purpose to: (1) check the box in Item 5 to indicate that the amendment amends information relating to the debtor, (2) check the box in Item 5 to indicate that the amendment is a name change, (3) enter in Item 6 the prior name of the debtor, and (4) enter in Item 7 the new name of the debtor. It states that it complied with these instructions.

Similarly, the purpose of the Amendment to Financing Statement 476 was to add collateral. The UCC Form Instructions advise the person completing an amendment for this purpose to describe the change in Item 8, either by describing the collateral to be added or deleted or by setting forth in full the collateral as amended, and to check the appropriate box indicating the method of description chosen. Burlingame Funding contends that it also complied with these instructions. Therefore, it seeks a summary adjudication that the amendments were valid and effective to perfect and to continue the perfection of its perfected security interest in the Debtor's personal property.

The Committee disagrees with this contention. It argues that the instructions for an amendment designed to reflect a mere name change for an existing debtor did not apply here. The Debtor was a new debtor. Qmect, Inc. was not just a new name for the original debtor: i.e., the Koelling-McNeill Partnership, changed to a corporate form. Under these circumstances, the Committee contends, it was necessary to check the boxes in both Items 5 and

40

9 and to enter the new debtor's name in Item 9a. Burlingame Funding replies that, even if the Committee is correct, the defect was not sufficient to invalidate the amendments. It notes that Cal. Comm. Code § 9506(a) provides that:

> A financing statement substantially satisfying the requirements of this part is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading.

The Court is not sufficiently clear on the law governing these issues to summarily adjudicate them at this time. It agrees with the Committee that, if it was appropriate to file an amendment to an existing financing statement to perfect a security interest in the personal property of a new debtor and in any event with respect to the new description of collateral, the box in Item 9 should have been checked and the name of Qmect, Inc. should have been entered in both amendments. However, the Court agrees with Burlingame Funding that the failure to do so would not invalidate the amendments because it did not render them seriously misleading. The boxes checked in Item 5 and the entry of the Debtor's name in Item 7 was sufficient to permit the public records to reflect the correct name of the new debtor. While the Debtor's name does not appear anywhere on the Amendment to Financing Statement 476, the Amendment does clearly indicate that it is amending Financing Statement 476. Financing Statement 476 does contain the Debtor's name.

Rather, the Court's uncertainty turns on whether a new initial financing statement should not have been filed to perfect a

41

security interest in collateral subsequently acquired by the Debtor more than four months after it acquired its assets from the Partnership. Clearly, under Cal. Comm. Code § 9508(a), with respect to the personal property collateral acquired by the Debtor from the Partnership, the existing perfected security interest continued notwithstanding the transfer of ownership. Under Cal. Comm. Code § 9508(a), the security interest would also attach and be perfected with respect to any personal property of the type described as collateral in the existing financing statement acquired by the Debtor within four months after the Debtor's became bound by the Partnership's security agreement with Comerica.

However, Cal. Comm. Code § 9508(b)(2) provides that, unless the difference in the names of the old and new debtor would not be seriously misleading, the existing financing statement is not effective to perfect a security interest in collateral acquired by a new debtor more than four months after the new debtor becomes bound under the security agreement unless an "initial financing statement" providing the name of the new debtor is filed before the expiration of the four months. An amendment to an existing financing statement would not appear to qualify as an "initial financing statement." As a result, Burlingame Funding's perfected security interest would appear to be limited to the personal property collateral transferred to it by the Partnership and any personal property within the collateral description acquired by the Debtor during the four months after it signed the Assumption

42

Agreement.  However, these statutes are sufficiently complex that the Court declines to make a ruling on these issues at this time without further briefing and argument by the parties.[20]

**6.  Sufficiency of Fred Koelling's Signature To Bind the Partnership**

Paragraph 26 of the Complaint alleges that the Comerica Deed of Trust was signed only by Fred Koelling, not by all of the general partners of the Partnership.  It alleges that Fred Koelling may not have been authorized by a resolution signed by all the general partners to sign the Comerica Deed of Trust on the Partnership's behalf.  As a result, the Complaint alleges, the Comerica Deed of Trust may be invalid.

Burlingame Funding seeks summary adjudication of this claim, declaring that the Comerica Deed of Trust may not be invalidated on this ground.  It contends that, even if it is established that Fred Koelling did not have authority to bind the Partnership, the Comerica Deed of Trust would still be valid unless it is proven

_____

[20]In its opposition to the motion, the Committee also contends that Cal. Comm. Code § 9326(a) subordinates Burlingame Funding's perfected security interest in at least some of the Debtor's personal property to the security interests of certain hypothetical secured creditors.  As a result, it contends that, to that extent, the security interest is subject to avoidance pursuant to 11 U.S.C. § 544(a)(1).  The allegations of paragraphs 21 and 23 do not assert this claim, and Burlingame Funding does not seek summary adjudication of it.  As a result, the Court will not make any ruling with respect to it.  However, the Court expresses doubt as to whether the holder of a security interest created by a new debtor which is perfected by filing a financing statement would qualify as the holder of a judicial lien within the meaning of 11 U.S.C. § 544(a)(1).

43

either that Comerica was aware of Fred Koelling's lack of authority at the time the Comerica Deed of Trust was signed or that the Comerica Deed of Trust was not executed for the apparent purpose of carrying on the business of the partnership in the ordinary course. In support of this proposition, Burlingame Funding cites Cal. Corp. Code § 16301 which provides as follows:

> (1) Each partner is an agent of the partnership for the purpose of its business. An act of a partner, including the execution of an instrument in the partnership name, for apparently carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership, unless the partner had no authority to act for the partnership in the particular matter and the person with whom the partner was dealing knew or had received notification that the partner lacked authority.
>
> (2) An act of a partner that is not apparently for carrying on in the ordinary course of the partnership business or business of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners.

In response, the Committee notes that it did not seek summary adjudication of this issue. Therefore, it is not obliged at this time to prove that Fred Koelling lacked authority to bind the Partnership to the Comerica Deed of Trust. To the contrary, the Committee contends that it is Burlingame Funding's burden to present evidence that Fred Koelling did have authority to sign the Comerica Deed of Trust or that signing the Comerica Deed of Trust was in the ordinary course of business of the Partnership. The Committee points out that Burlingame Funding has presented no evidence in support of either of these propositions.

44

The Committee contends that execution of a deed of trust with respect to all of a partnership's real property is clearly not within the ordinary course of the partnership's business. According to the Committee, this is precisely the type of transaction that requires approval of all general partners.  See Tsakos Shipping & Trading, S.A. v. Juniper Garden Town Homes, Ltd., 12 Cal. App. 4th 74, 93 (1993)(partner not authorized to bind partnership to guaranty without specific authority, at least implied from the previous course of dealing between the parties). The Committee asserts that no prudent lender would accept a deed of trust executed by one partner on behalf of a partnership without an authorizing resolution signed by the other partners.

Burlingame Funding responds that, because it has sought a summary adjudication of this issue, if it wishes to oppose this request, the Committee is required to present evidence that Fred Koelling was not authorized to sign the Comerica Deed of Trust. In support of this contention, Burlingame Funding cites Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986).  See also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

The Court concludes that Burlingame Funding is entitled to summary adjudication that Fred Koelling's signature alone on the Comerica Deed of Trust was sufficient to bind the Partnership.  As noted above, Cal. Corp. Code § 16301 provides that a partner may bind the partnership by any act in the ordinary course of business of the partnership, including the execution of an instrument,

45

Case: 04-04189   Doc# 38   Filed: 09/21/05   Entered: 09/22/05 14:54:27   Page 45 of
62

unless the person with whom the partner was dealing knew that the partner lacked authority. In its motion, Burlingame Funding did not squarely contend that Fred Koelling had express authority from the other partners of the Partnership to execute the Comerica Deed of Trust. Therefore, to resist summary adjudication of this issue, the Committee was not compelled to present evidence that he lacked express authority.

However, Burlingame Funding did squarely put at issue whether execution of the Comerica Deed of Trust was in the ordinary course of the Partnership's business and whether Comerica had notice that Fred Koelling lacked authority to sign the Comerica Deed of Trust on behalf of the Partnership. The Committee treated the first issue as a legal issue and cited authority to support its contention that executing a deed of trust was not an ordinary course transaction. It presented no evidence as to the latter factual issue.

The Court concludes that the execution of the Comerica Deed of Trust was within the ordinary course of the Partnership's business. The meaning of the phrase "ordinary course" in this context is not the same as its meaning in a bankruptcy context. The execution of a deed of trust encumbering all the real property of a chapter 11 bankruptcy debtor would clearly not be viewed as in the ordinary course of business. However, in the nonbankrupt commercial world, the phrase is much less restrictive.[21] A

_____

[21]The case cited by the Committee is clearly distinguishable. In <u>Tsakos</u>, after a limited partnership had

46

transaction is in the ordinary course of a partnership's business if the purpose of the transaction is to carry on the business of the partnership. The execution of the Comerica Deed of Trust clearly qualifies within that broader definition.[22]

**7. Sufficiency of Fred Koelling's Signature To Bind Debtor**

Paragraph 27 of the Complaint alleges, on information and belief, that any promissory note, security agreement, or other loan document not signed by two corporate officers of the Debtor and not authorized by a valid resolution of the Debtor's Board of Directors does not bind the Debtor. It alleges that the following

---

been dissolved by agreement of the partners, a general partner borrowed money for his own benefit and signed a document purporting to bind the partnership to a guaranty of the loan. The Tsakos court noted that, even before dissolution, a guaranty of the debt of a third party would not normally be viewed as in the ordinary course of a partnership's business. Tsakos, 12 Cal. App. 4th at 93. By contrast, in Owens v. Palos Verdes Monaco, 142 Cal. App. 3d 855, 866-67 (1983), the court held that the sale of a partnership's sole asset was within its ordinary course of business where the purpose of the partnership was to sell the asset. Here, the Fixtures Deed of Trust was part of the transaction by which Koelling-McNeill obtained the funds necessary to its business operations. It is difficult to see how this transaction could be viewed as outside the partnership's ordinary course of business.

[22]Burlingame Funding also asserts that the Debtor should be estopped from denying its obligations pursuant to the Fixtures Deed of Trust after having accepted the benefits of the loans secured by it. See Nygard v. Dickinson, 97 F.2d 53, 57 (9th Cir. 1938)(knowledge of work done and accepting its benefits may estop principal from denying authority of agent to contract for it on principal's behalf); Cowan v. Tremble, 111 Cal. App. 458 (1931). Because the Court concludes that Burlingame Funding is entitled to summary adjudication of this issue for other reasons, the Court need not address this ground.

47

documents executed by the Debtor in favor of Comerica fail for this reason: (1) the Agreement Supplementing Deed of Trust, dated November 5, 2001, (2) the Assumption/Modification Agreement, dated November 8, 2001, (3) the Business Loan Agreement, dated April 24, 2002, and (4) the Security Agreement, dated April 24, 2004.

Burlingame Funding seeks summary adjudication of this issue, declaring it to have no merit as a matter of law. It notes that Cal. Corp. Code § 208(b) provides that "any contract...made in the name of a corporation" binds the corporation if it is: (1) "authorized or ratified by the board," (2) "done within the scope of the authority, actual or apparent, conferred by the board," or (3) "within the agency power of the officer executing it...." Burlingame Funding notes that it has in its possession copies of corporate resolutions and certifications signed by the Koellings, identifying Fred Koelling as the Debtor's president, with authority to contract for the Debtor. Moreover, it argues that, even without these corporate resolutions, the Court should find and conclude that it was within Fred Koelling's apparent or implied authority to execute these contracts. See Memorial Hospital Assoc. Of Stanislaus County v. Pacific Grape Prods. Co., 45 Cal. 2d 634, 637 (1955)(corporation's president/manager had implied power to execute pledge agreement).

The Committee responds that, for a contract to be binding on a corporation, it must be either: (1) authorized by a resolution of the Board of Directors or (2) signed by both: (a) the president or a vice-president and (b) the secretary or the treasurer. In

48

support of this contention, it cites <u>Snukal v. Flightways Mfg.</u>, 23 Cal. 4th 754 (2000)[23] and Cal. Corp. Code § 313.[24]  To date, the Committee notes, Burlingame Funding has not produced competent evidence of a corporate resolution authorizing Fred Koelling to sign the specified documents.  The copies of the resolutions produced by Burlingame Funding are either unsigned or relate to other lending transactions.  In addition, they are merely attached to the declaration of Janice Judson, who the Committee contends is not competent to authenticate them.

Moreover, the Committee asserts that, even if such corporate resolutions exist and are properly authenticated, they would be invalid.  A corporation must have three directors if it has at least three shareholders.  <u>See</u> Cal. Corp. Code § 212(a).  The Debtor has always had three shareholders.  However, the Debtor appears to have had only two directors when the contracts specified in paragraph 27 of the Complaint were signed.  Because

_____

[23]The Committee's citation was incorrect.  The Court assumes that the Committee meant to provide the Supreme Court citation rather than the lower appellate court citation, particularly since the year provided in the Committee's citation was the year of the Supreme Court decision, not that of the lower court decision.

[24]Section 313 provides, in pertinent part, that "any ... contract ... executed ... between any corporation and any other person, when signed by ... the president ... and the secretary, any assistant secretary, the chief financial officer or any assistant treasurer of such corporation, is not invalidated as to the corporation by any lack of authority of the signing officers in the absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the same."  Cal. Corp. Code § 313.

49

it was improperly constituted, the Committee reasons, the Board did not have authority to elect Fred Koelling as President of the Debtor. Therefore, Fred Koelling had no authority to contract for the Debtor.

Finally, the Committee contends that the case law with respect to apparent and implied corporate authority is conflicting. In support of this contention, it cites two purported conflicting decisions: i.e., <u>Citizens' Securities Co. v. Hammel</u>, 14 Cal. App. 564 (1910) and <u>McKiernan v. Lenzen</u>, 56 Cal. 61, 64 (1880). The Committee asserts that, to a large degree, this case law has been supplanted by Cal. Corp. Code § 313. For this reason, the Committee argues that determining whether Fred Koelling had the apparent authority to bind the Debtor with respect to the specified contracts should await an evidentiary hearing.

In reply, Burlingame Funding contends that the Court should summarily adjudicate that the contracts bind the Debtor because: (1) it was within Fred Koelling's apparent authority to sign them on the Debtor's behalf; <u>see</u> <u>Mem'l Hosp. Assoc. of Stanislaus County v. Pacific Grape Prods. Co.</u> 45 Cal. 2d 634 (1955); <u>Snukal v. Flightways Mfg., Inc.</u> 23 Cal. 4th 754 (2000); and (2) the Debtor should be estopped from contending that it is not bound by them after having accepted the benefits of the contracts; <u>see</u> <u>Nygard v. Dickinson</u>, 97 F.2d 53, 57 (9th Cir. 1938); <u>Cowan v. Tremble</u>, 111 Cal. App. 458 (1931).

The Court concludes that Burlingame Funding is entitled to summary adjudication of this issue. The Committee may be correct

50

that Burlingame Funding cannot rely on Cal. Corp. Code § 313 to establish that the contracts bind the Debtor. Clearly, the sole signature of Fred Koelling, the Debtor's president, was not sufficient to give rise to the conclusive presumption of authority created by Cal. Corp. Code § 313. If the Debtor's Board was improperly constituted, as it appears to have been, any corporate resolution adopted by it may have been invalid.

However, Cal. Corp. Code § 313 is not the only means by which it can be established that a contract executed by a corporate officer binds the corporation. As noted in <u>Snukal</u>, "Corporations Code section 313 leaves intact the other party's ability to assert the validity of an instrument under existing common law doctrines when the signatory or signatories do not hold the corporate offices specified in that statute." <u>Snukal</u>, 23 Cal. 4th at 783.[25]

The cases cited by the Committee for its contention that the law governing apparent authority is conflicting are not particularly persuasive, if for no other reason than their age. More current case authority clearly establishes that "[w]here the

_____

[25]In <u>Snukal</u>, an individual who was the president, secretary, and treasurer for a corporation leased a private residence in the name of the corporation. When he defaulted on the rent, the lessor sued the corporation for the debt. The corporation defended on the ground that the board of directors had not authorized the individual to enter into the lease. It contended that Cal. Corp. Code § 313 did not apply because the individual indicated only his office as president when he signed the lease. It also contended that to gain the conclusive presumption of authority granted by section 313, the lease had to have been signed by two individuals holding the offices specified. The California Supreme Court rejected both contentions. <u>Snukal</u>, 23 Cal. 4th at 776-87.

51

president of a corporation is also its general manager, having the power to superintend and conduct its business, he has implied authority to make any contract or do any other act appropriate in the ordinary course of its business." Mem'l Hosp., 45 Cal. 2d at 637. As discussed with respect to the preceding issue, ordinary course should not be understood in the same sense that it is used by the Bankruptcy Code. The Court views contracts executed with a corporation's primary lender to enable the corporation to obtain the operating capital required for its business to be in the ordinary course of the corporation's business.

Moreover, the Court agrees that the Debtor is estoped from denying that it is bound by the contracts after having accepted the loans and used the funds. See McGirr v. Gulf Oil Corp., 41 Cal. App. 3d 246, 257 (1974)(principal was estopped from asserting agent's lack of authority to enter into real estate contract where principal had had complete knowledge of the circumstances and had accepted the benefits of the contract).

**8.   Was Burlingame's Deed of Trust Altered After Its Execution?**

Paragraphs 34 of the Complaint alleges, on information and belief, that the Burlingame Deed of Trust was altered after it was executed by the Debtor and is therefore invalid. Paragraph 35 alleges, on information and belief, that the acknowledgement of the Burlingame Deed of Trust is incorrect, inadequate and/or altered and is therefore invalid. Paragraph 36 alleges that certain of the alleged advances upon which Burlingame's claims are

52

based were not actually made to or for the benefit of the Debtor and thus do not constitute valid debts of the Debtor.

Burlingame asks that these claims be "disregarded" or "stripped" from the complaint. It views them as allegations of fraud which must be stated with particularity. See Fed. R. Civ. Proc. 9(b); Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003). Burlingame Funding makes the same request with respect to the allegations in paragraph 28: i.e., that the acknowledgements of the Agreement Supplementing Deed of Trust and the Assumption/Modification Agreement, both of which were executed by the Debtor in favor of Comerica, are incorrect and/or inadequate and are therefore invalid, unenforceable and/or avoidable.

The Committee responds that Rule 9(b) is irrelevant as the paragraphs in question contain no allegations of fraud. Moreover, it asserts that a challenge based on Rule 9(b) is properly raised by a motion to strike, not a motion for summary judgment. If granted, the Committee is entitled to leave to amend to state its claim with more specificity. In reply, Burlingame argues that summary judgment should be granted because, once again, the Committee has failed to provide any evidence that the Burlingame Deed of Trust or any of the related documents were altered after they were signed. It contends that it challenged this allegation in its countermotion for summary judgment. Moreover, it disagrees with the Committee's contention that the allegations do not assert fraud.

53

The Court agrees with the Committee that the allegations in paragraphs 28, 34, 35, and 36 do not assert claims of fraud or fraudulent conduct. There is no allegation that any alteration was made with the intent to deceive. Therefore, Rule 9(b) of the Federal Rules of Civil Procedure does not apply.

If Burlingame and Burlingame Funding were correct that, in their counter-motion, they had asserted that the documents were not altered, they would be entitled to a summary adjudication with respect to this issue given the Committee's failure to produce any evidence that they were altered. As discussed above, the Committee would have had the burden of producing evidence of alteration. However, Burlingame and Burlingame Funding do not cite the page of their counter-motion on which they make this assertion, and the Court has been unable to locate it. Therefore, the request for summary adjudication of this issue will be denied.

**9. Was Interest Rate on Burlingame's Deed of Trust Usurious?**

Paragraph 37 of the Complaint alleges, on information and belief, that certain of the debts upon which Burlingame's claims are based include usurious interest or unconscionable charges and are therefore unenforceable. The California Constitution imposes a cap on the interest rate that entities may charge on loans. However, certain lenders are exempt from its provisions. <u>See</u> Cal. Fin. Code § 22002.

In its motion, Burlingame asserts that is a "certified lender," licensed by the California Department of Corporations and

54

thus exempt from the usury law. <u>See</u> Cal. Fin. Code § 22002. It asks the Court to summarily adjudicate this claim in its favor. The Committee responds that the burden is on the Burlingame to establish the right to an exemption from usury laws. <u>See</u> Cal. Fin. Code § 22053. To do so, Burlingame must prove that it was licensed when the loan was made, that the loan was made from its licensed place of business (or the borrower requested that it be made at some other location), and (iii) that the lender's license was prominently posted at its licensed place of business. Cal. Fin. Code §§ 22151 & 22155. Burlingame has only provided evidence that Burlingame held a license at the time it made the loan to the Debtor. It has not offered any evidence on the other two points.

In reply, Burlingame argues that its right to the exemption is created by the California Constitution. According to Burlingame, §§ 22151 and 22155 are regulatory in nature, and the failure to satisfy them does not result in a forfeiture of the lender's right to claim the exemption. It does not cite any authority for this contention.[26]

---

[26]Burlingame also contends that the burden is on the Committee, as the party opposing summary adjudication, to produce evidence that the loans made Burlingame did not comply with the second two requirements: i.e., that the loan was made from Burlingame's licensed place of business (unless the Debtor requested that it be made elsewhere) and that the license was prominently posted at that place of business. The Court is unwilling to grant summary adjudication of this issue on this ground for two reasons. First, the argument was raised for the first time in Burlingame's reply. As a result, the Committee has not had an opportunity to reply to it. Second, it is not

55

Article XV, section 1, of the California Constitution establishes a limit on the rate of interest that may be charged on loans or forbearances of "any money, goods or things in action, or on accounts after demand...." However, it provides an exemption from this limitation for certain types of lenders: e.g., banks, credit unions, pawnbrokers. Included in the list of exempt lenders is the catchall phrase "or any other class of persons authorized by statute...." Cal. Const., art. XV, sec. 1. Burlingame does not fit into any of the specified categories of lenders. Thus, any right to an exemption from the usury limitations on the interest rate it can charge is created by statute: i.e., the California Finance Code.

The statute upon which Burlingame relies for its exemption is the California Finance Lenders Law, Cal. Fin. Code § 22000 et seq. The statute contains four articles: Article 1 Definitions, beginning with section 22000, Article 2 Exemptions, beginning with section 22050, Article 3 Licensing, beginning with section 22100, and Article 4 Regulations, beginning with section 22150. Section 22002, which is contained in Article 1, provides that the statute creates a class of exempt persons pursuant to Section 1 of Article XV of the California Constitution." Section 22009, also contained

---

clear to the Court that it is an element of a plaintiff's claim for usury. It seems more likely that the defendant must assert that it is exempt as a defense to a usury claim. A plaintiff should not be required to produce evidence to counter a defense asserted by a defendant to resist a motion for summary adjudication. The parties have not addressed these issues. Therefore, summary adjudication on this ground is inappropriate.

56

in Article 1, defines "finance lender" to include any person engaged in making commercial loans.

The primary thrust of Article 2 is to specify those persons and transactions to which the statute does not apply. Section 22050(e), which is contained in this article, provides that the statute does not apply to commercial lenders which make no more than one loan in a twelve month period. Neither Burlingame nor the Committee has discussed whether Burlingame is removed from coverage by the statute pursuant to this provision or the effect of that removal. Section 22053, which is also contained in Article 2, states that the burden of proving an exemption is upon the person claiming it.

Article 3, entitled Licensing, contains section 22100 which provides, in pertinent part, that "[n]o person shall engage in the business of a finance lender ... without obtaining a license from the commissioner. Section 22151 and 22155, the sections primary relied upon by the Committee, are contained in Article 4, entitled "Regulations." Section 22151 requires the licensee to display the license conspicuously in the place of business authorized in its license. Section 22155 provides that no licensee shall make commercial loans at any other place of business than that named in the license unless the borrower requests that it do so.

Burlingame does not appear to contend that a borrower could not assert a claim of usury against an unlicensed finance lender. Therefore, the fact that a statutory requirement is not contained in Article 2, entitled "Exemption," should not be determinative of

57

whether its violation gives rise to a private right of action. Moreover, the fact that §§ 22151 and 22155 appear in an article entitled "Regulations" is not determinative of the remedy available for their violation. "Whether a regulatory statute creates a private right of action depends on legislative intent." Goehring v. Chapman Univ., 121 Cal. App. 4th 353, 375-79 (2004)(statute requiring unaccredited law schools to provide students with disclosure statements after receiving tuition payments created private right of action, entitling students to refund of tuition despite absence of legislative history indicating intent to create right of private action and absence of any specific statutory remedy).

In determining legislative intent, the first place to look is at the words of the statute, given their ordinary meaning and construed in their statutory context. Id. Section 22001 of the California Financial Code provides that the statute shall be liberally construed and applied to promote the statute's underlying purposes. Its underlying purposes include ensuring "an adequate supply of credit to borrowers[,]" protecting "borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders[,]" and permitting and encouraging the development of fair and economically sound lending practices[.]" Cal. Fin. Code § 22001(a)(1), (4), & (5).

Based on these stated purposes, the Court is inclined to conclude that a violation of §§ 22151 or 22155 does give rise to

58

a private right of action.  The requirement that a commercial lender be licensed does little, by itself, to protect the borrower.  The principal benefit is conferred by the requirement that the license be posted in the lender's authorized place of business and that the loan transaction be made there.  By this means, the borrower is put on constructive notice that the lender is entitled to charge a usurious rate of interest.

However, because this issue has not been adequately briefed and because, as discussed above, Burlingame may not be covered by the statute at all, the Court will make no ruling on this issue at this time other than to deny Burlingame's motion for summary adjudication.

**CONCLUSION**

**A.  Committee's Motion:** The Court summarily adjudicates the following issues:

1.  The Lost Note and the Revolving Note are not cross-collateralized by the Comerica Deed of Trust.

2.  Burlingame Funding does not have a security interest in any equipment leased by the Debtor pursuant to "true leases" but does have a lien on the leases themselves as contract rights.

3. Neither of the Lenders has a security interest in the Debtor's deposit accounts.

4.  Neither of the Lenders has a security interest in the Debtor's two delivery trucks.

5.  The Real Property Tax Lien is senior in priority to any deeds of trust held by the Lenders on the Real Property.

59

6. GECC's lien on the grid flooring and other fixtures is senior to the Lenders' deeds of trust on the Real Property.

7. Article 3 of the California Commercial Code only applies to negotiable instruments.

8. The Burlingame and Burlingame Funding Proofs of Claim are inadequate to establish a prima facie case in support of their claims. As a consequence, Burlingame and Burlingame Funding must present sufficient evidence to prove the validity and amount of their claims.

9. Burlingame's secured claim is undersecured.

The Court denies the Committee's request for summary adjudication of all other issues. Counsel for the Committee is directed to submit a proposed form of order in accordance with the Court's rulings.

**B. Lenders' Cross-Motion:** The Court summarily adjudicates the following issues:

1. Burlingame Funding has a perfected security interest in the Fixtures to the extent the Fixtures were acquired before or within four months of the transfer of the Real Property and Fixtures to the Debtor.

2. Burlingame Funding's failure to record an assignment of the Comerica Deed of Trust or to file an assignment of the security interest in the Debtor's personal property did not render either security interest unperfected.

3. The Debtor's failure to sign the Amendments to Financing Statements 177 and 476 did not render the amendments invalid.

60

4.  Fred Koelling's signature on the Comerica Deed of Trust was sufficient to bind the Partnership.

5.  Fred Koelling's signature on the contracts specified in paragraph 27 of the Complaint was sufficient to bind the Debtor.

The Court denies Burlingame's and Burlingame Funding's request for summary adjudication of all other issues.  Counsel for Burlingame and Burlingame Funding is directed to submit a proposed form of order in accordance with these rulings.

END OF DOCUMENT

61

```
                          COURT SERVICE LIST

Philip J. Nicholsen
221 Main St., Ste. 740
San Francisco, CA 94105

Tobias S. Keller
Pachulski, Stang, Ziehl,
 Young, Jones & Weintraub P.C.
Three Embarcadero Center, Ste. 1020
San Francisco, CA 94111-4023

Robert S. Moore
Allen Matkins Leck Gamble
 & Mallory LLP
Three Embarcadero Center, 12$^{th}$ Floor
San Francisco, CA 94111
```

62